UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| IN THE MATTER OF THE SEARCH OF: | |
|---|---|
| A BLACK TCL SMARTPHONE SEIZED FROM DEWAYNE POOLE ON FEBRUARY 1, 2026 AND IN SECURE STORAGE AT THE PITTSBURGH BUREAU OF POLICE COMPUTER CRIMES UNIT | Magistrate No. 26-270 |

**APPLICATION/AFFIDAVIT FOR SEARCH WARRANTS**

I, Task Force Officer William Churilla, having been duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. Your Affiant, Task Force Office William Churilla, being duly sworn according to law, aver that the following is true and correct to the best of my knowledge, information and belief and is based on personal knowledge or information provided by reliable sources.

2. Your Affiant is a member of both the Pittsburgh Bureau of Police (PBP) and is also a Task Force Officer with the Drug Enforcement Administration (DEA). As a Pittsburgh police officer, I am empowered under state law to make arrests for violations of state criminal laws, and I am also empowered to execute state search warrants. As a DEA Task Force Officer, I am empowered under federal law to make arrests for violations of federal criminal laws, and I am also empowered to execute federal search warrants.

3. I have a High School Diploma, as well as a bachelor's degree in criminology and business management from Duquesne University. After my 1988 graduation from Duquesne

University, I worked for approximately 5 years with juveniles adjudicated of crimes at the Allegheny Academy Juvenile Facility. In 1997, I began to work full-time as a police officer for the City of Pittsburgh. I spent the first several years as a patrol officer in the Zone 2 section of Pittsburgh which encompasses neighborhoods including the Hill District. I remain employed with the PBP and became a Detective in approximately 2007.

4. In 2013, I was assigned to Narcotics and Vice where I primarily investigated drug and firearm offenses. I have purchased drugs including marijuana, cocaine, heroin and fentanyl in an undercover capacity on many occasions and have been involved as a back-up officer in many undercover purchases by other officers. I have been involved in numerous controlled purchases, of various types of drugs, by cooperating individuals. I have obtained numerous search warrants regarding drug and firearm violations and have been involved in numerous similar search warrants obtained by my fellow police officers.

5. I have been asked to render an expert opinion on many occasions regarding whether various circumstances show that drugs were possessed for distribution, as opposed to personal use. I have qualified and testified as a narcotics expert in court more than a dozen times. My relevant trainings include the initial Pittsburgh Police Academy training, as well as the "Top Gun" Narcotics Investigation course, Pennsylvania Electronic Surveillance "A" certification training, ATF "Characteristics of Armed Individuals" training, and interrogation and interview training. My drug and firearm experience comes from working not only with many other members of the PBP, but with numerous other local, state and federal investigators including the ATF, FBI and DEA. I have been involved in over 1000 arrests in my career, many involving guns, drugs or both.

6.  I am also experienced in reviewing the contents of cellular telephones associated with drug trafficking as I have examined the contents of hundreds of cellular telephones associated with drug trafficking and firearm possession.

7.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. This affidavit is largely based on information obtained from reports of other law enforcement officers, laboratory testing results, and other documents. Based on the facts set forth below, I have probable cause to believe that Dewayne POOLE ("Poole") violated 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Possession with the Intent to Distribute Controlled Substances) ("TARGET OFFENSES").

## ITEM TO BE SEARCHED

8.  A black TCL smartphone, seized on February 1, 2026, from the person of Dewayne POOLE (hereinafter **TARGET DEVICE 1**). **TARGET DEVICE 1** is currently securely stored at the Pittsburgh Bureau of Police Computer Crimes Unit, and pictures of **TARGET DEVICE 1** are included in Attachment A.

## PROBABLE CAUSE

9.  On February 1, 2026, the Pittsburgh Bureau Police officers arrested POOLE on suspicion of driving while under the influence of alcohol. During a search incident to arrest, the officers seized from POOLE's person a knotted bag of Marijuana, **TARGET DEVICE 1**, and seven loose $20 USD bills. In a later search of his jacket, Officers located $105 in various currency denominations indicative of individual selling illegal substances.

10. After officers transported POOLE Pittsburgh Police Zone 6 Station, they noticed a sock that had not been there are the beginning of their shift where POOLE had been seated. Although POOLE denied ownership of the sock, later analysis of video from the parole car

confirmed that POOLE had taken an object off of his person and attempted to conceal it in the patrol vehicle.

11. From inside the sock found in the patrol vehicle, officers found one large bag of small individually knotted bags of suspected crack cocaine, one blue bag of suspected oxycodone pills, two large knotted bags of suspected crack cocaine, and one medium knotted bag of suspected crack cocaine.

12. Based on my training and experience, it is my opinion that POOLE possessed the suspected narcotics at issue with the intent to distribute, as opposed to for personal use. There was no user paraphernalia recovered related to the suspected controlled substances, and POOLE also appeared to be a healthy individual with no outwards signs of drug user.

13. Furthermore, the amount of the suspected controlled substances recovered from POOLE was more than the amount for personal usage. Drug dealers will often carry multiple types of narcotics to cater to their clientele and have crumpled up currency on their persons based off of fast transactions during open air drug deals. In contrast, drug users typically just have their drug of choice in their possession.

14. Officers packaged the evidence and unofficially weighed them at the Zone 3 Southside Substation as so:

- EX 1: (1) Knotted bag of marijuana (unofficially 6.3 grams)
- EX 2: (16) Small individually knotted baggies of suspected crack cocaine (unofficially 5.82 grams)
- EX 3: (90) Suspected Ecstasy Tablets (unofficially 20.16 grams)
- EX 4: (8) Suspected Oxycodone Pills (unofficially 0.82 grams)

- EX 5: (1) Large Knotted Bag of Suspected Crack Cocaine (unofficially 57.2 grams)
- EX 6: (1) Large Knotted Bag of Suspected Crack Cocaine (unofficially 25.32 grams)
- EX 7: (1) Medium Knotted Bag of Suspected Crack Cocaine (unofficially 8.39 grams)

15. The suspected controlled substances were sent to the Crime lab to be analyzed for confirmation of seized substances.

### Criminal History

16. A review of Dewayne Poole's certified criminal history revealed multiple drug trafficking felony convictions, including the following:

17. OTN: H170173-3, with a disposition date of 8/15/2002. POOLE pleaded guilty in front of the Honorable Judge Raymond A. Novak to possession and possession with intent to distribute of a controlled substance and was sentenced to 4 months to 23 months of confinement.

18. OTN: G274408-1, with a disposition date of 8/23/2004. POOLE once again plead guilty in front of the Honorable Judge Raymond A. Novak to possession and possession with intent to distribute of a controlled substance and was sentenced to three years of probation.

19. At the federal level, POOLE has been federally indicted and convicted twice in the following matters:

20. On August 10, 2007, POOLE was adjudicated guilty under case 2:06-cr-0027-AJS by the Honorable Chief United States District Judge Donetta W. Ambrose of the following charges: 18 U.S.C. 922(g)(1) and 21 U.S.C. 841(a)(1) and 841(b)(1)(B)(iii) and sentenced to a total confinement of 188 months.

21. On February 15, 2022, Dewayne POOLE was adjudicated guilty under case 2:21-cr-00421-AJS by the Honorable United States District Judge Arthur J. Schwab of the following charges: 922(j) possession of a stolen firearm and sentenced to 72 months of imprisonment.

22. In my 29 years of law enforcement experience, I am aware that it is a common practice for drug traffickers to use cellular telephone, like **TARGET DEVICE 1**, to further their illegal activities, and that evidence of the TARGET OFFENSE is likely to be found on **TARGET DEVICE 1**.

23. Based on my training and experience, I am aware that targets of narcotics trafficking investigations utilize cellular telephones and electronic devices to not only arrange meetings with their drug customers but also speak with fellow co-conspirators as well as their drug sources of supply.

24. I am also aware that people in general, and those involved in drug trafficking keep their cellular telephones on their persons or in close reach. For drug traffickers, the cellular phone has become a tool to facilitate criminal activity; specifically, the phone is used to arrange meetings with customers, to speak with fellow co-conspirators, and to coordinate with sources of supply.

25. Based upon my training and experience, I am aware that it is generally a common practice for drug traffickers to store the names and phone numbers of drug customers and photographs and video detailing illegal activities in cellular telephones and electronic devices. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep

"pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

26. Drug traffickers also often take group photographs with conspirators posing with paraphernalia, money, firearms and/or drugs. Many cellular telephones, including **TARGET DEVICE 1**, have a camera feature that is readily capable of capturing and storing these group photos and similar videos

27. Drug traffickers often store phone numbers and contact information in the directories of their cellular phones.

28. Based on my experience and familiarity with cellular telephones like **TARGET DEVICE 1** have voicemail and telephone directory features, as well as camera features which allow the user to take photographs and videos and store them in the cellular phone's memory card. Based on my experience and training, statements by other law enforcement officers, and personal observations, I know that because of the storage capacity of cellular telephones, the portability of cellular telephones, the ease with which information stored on a cellular telephone may be accessed and/or organized, and the need for frequent communication in arranging narcotics transactions, cellular telephones are frequently used by individuals involved in drug trafficking. In particular, I and other law enforcement officers have found that information frequently maintained on cellular telephones includes the contact numbers of other co-conspirators, contact numbers for narcotics customers and stored photographs of criminal activities. This evidence will come in the form of caller identification information, call log information, telephone numbers, address information,

notes or other identification information, as well as opened and unopened voicemail and/or text messages, photographs, videos and information about access to the Internet.

29. As set forth above, this affidavit seeks authorization to extract data from **TARGET DEVICE 1** to search that data for evidence of the TARGET OFFENSE.

30. Based on my training and experience, the following types of evidence will likely be found on **TARGET DEVICE 1**:

• Incoming and outgoing call, text and other chat application message logs;

• Contact lists;

• Calendars;

• Photo and video galleries and related metadata;

• Sent and received text, video and audio messages/files;

• Records related to online searches and sites viewed via the internet;

• Information revealing the user of the cellular telephone and the telephone number associated with the cellular telephone;

• Online or electronic communications sent and received, including email, chat, and instant messages;

• Records of FaceTime communications;

• Records related to location of the cellular telephone;

• Notes; and

• Voice messages.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

31. As described above, this Application seeks permission to search **TARGET DEVICE 1** for evidence of violations of the TARGET OFFENSE.

32. Based on my knowledge, training, and experience, I know that files or remnants of such files can be recovered months or even years after they have been sent/received, accessed, captured, downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files including photos or videos of firearms, downloaded to a storage medium can be stored for years at little or no cost. Similarly, chat communications can be stored locally on the device and are also able to be backed up to remote servers. Users can generally use these remote backups to recover deleted or lost communications.

33. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

34. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, an electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

35. Wholly apart from user-generated files, electronic device storage media—in particular, electronic devices' internal storage—contain electronic evidence of how an electronic device has been used, what it has been used for, where it was located, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Electronic device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

36. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the cellular telephone consistent with the warrant. The examination requires technicians to extract data from the cellular telephone using forensic software. That data will then be searched for the evidence described above.

38. As the cellular telephone will be in law enforcement custody, I ask permission for law enforcement to search these devices at any time day or night.

## **CONCLUSION**

39. For the reasons set forth below, there is probable cause to believe that evidence of the TARGET OFFENSE will be found on **TARGET DEVICE 1**.

40. The above information is true and correct to the best of my knowledge, information, and belief.

/s/ *William Churilla*
William Churilla,
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b) (2) (A),
this 17th day of February , 2026.

_____
THE HONORABLE KEZIA O. L. TAYLOR
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**TARGET DEVICE 1:** A black TCL SMARTPHONE, seized on February 1, 2026, from the person of Dewayne POOLE and currently in secure storage at the Pittsburgh Bureau of Police Computer Crimes Unit and pictured below:



## ATTACHMENT B
## LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED

1.  Records, communications stored at the time the warrant is served (i.e., no real-time communications will be intercepted and searched during service), data, and textual and graphic files (including photographs and videos), evidencing who used the device and when and from where or a violation of Title 18, United States Code, Sections 922(g)(1) or 924(c), or Title 21, United States Code, Sections 841 or 846, including:

- Incoming and outgoing call, text and other chat application message logs;
- Contact lists;
- Calendars;
- Photo and video galleries and related metadata;
- Sent and received text, video and audio messages/files;
- Records related to online searches and sites viewed via the internet;
- Information revealing the user of the cellular telephone and the telephone number associated with the cellular telephone;
- Online or electronic communications sent and received, including email, chat, and instant messages;
- Records of FaceTime communications;
- Records related to location of the cellular telephone;
- Notes; and
- Voice messages.

2.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. However, no real-time communications will be intercepted and searched during execution of the search warrant.

3. In searching the cellular telephone, investigating officers and agents may examine all of the data contained in the cellular telephone to view its precise contents and determine whether the cellular telephone and/or its data falls within the items to be seized as set forth above. In addition, they may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.